UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SCOTT BENNETTS,

                    Plaintiff,                          Case No. 12-cv-14640

v                                                  Honorable Thomas L. Ludington

AT&T INTEGRATED DISABILITY SERVICE
CENTER, et al.,

                    Defendants.

_____/

**ORDER GRANTING IN PART PLAINTIFF'S CROSS-MOTION TO REVERSE
ADMINISTRATOR, DENYING DEFENDANT'S MOTION FOR JUDGMENT, AND
REMANDING THE CASE TO THE PLAN ADMINISTRATOR**

Plaintiff Scott Bennetts filed this action under the Employee Retirement Income Security

Act ("ERISA", 29 U.S.C. § 1001 et seq. During his employment at AT&T, Bennetts was

covered by the AT&T Midwest Disability Benefits Program (the "Plan") administered by

Sedgwick Claims Management Services, Inc. and AT&T. In his complaint, Bennetts alleges that

AT&T wrongly denied his claim for Long-Term Disability benefits under the Plan.

Bennetts and AT&T each filed a motion for summary judgment on the administrative

record. Because AT&T's denial of Bennetts's request for Long-Term Disability benefits was not

the result of a deliberate, reasonable process, the denial was arbitrary and capricious. The case

will with therefore be remanded to the Claim Administrator for further review.

**I**

All of the pertinent facts in this case appear in the administrative record. Under *Wilkins*

*Baptist Healthcare System*, "the district court [is] confined to the record that was before the Plan

Administrator." 150 F.3d 609, 615 (6th Cir. 1998).

**A**

In April 2001, Michigan Bell Telephone Company hired Bennetts as a customer service specialist installing above and below ground cable.   Bennetts's job duties consisted of installation and repair of residential and business phone systems.

As a Michigan Bell employee, Bennetts participated in the AT&T Midwest Disability Benefits Program ("the Plan").   The Plan is a self-funded plan that is administered by Sedgwick Claims Management Services, Inc.   Under the terms of the Plan, participants are entitled to Long-Term Disability benefits when:

> You are considered Disabled for purposes of Long-Term Disability Benefits under this Program when the Claims Administrator determines that you meet all of the following:
>
> • You have an illness or injury, other than accidental injury arising out of and in the course of employment by the Company or a Participating Company, supported by objective Medical Documentation.
>
> • Such illness or injury prevents you from engaging in any occupation or employment (with reasonable accommodation as determined by the Claims Administrator), for which you are qualified or may reasonably become qualified based on education, training, or experience.

SB0652.

**B**

In 2004 Bennetts sustained a back injury within the scope of his employment in 2004 that required a cervical fusion at multiple levels in 2005.   Following surgery, he returned to work at AT&T.   In 2006, Bennetts was diagnosed with "Status post cervical laminectomy at C3-4, C5-6; and a half of C7; anxiety and depression."   Pl.'s Cross-Mot. 1.

Bennetts became unable to work in 2010 due to the pain in his neck and back.   In October 2010, Bennetts underwent an MRI that reported:

> Impression: 1. Postsurgical changes of the cervical spine with metallic plate as seen as described above.  2. Disc osteophyte complex level C6-C7 with narrowing of neural foramina on the left side causing moderate spinal canal narrowing.  Cervical sponsolosis at level C5-C6 also causing moderate spinal canal narrowing.

SB0220-222.  Following the MRI, Bennetts received cervical epidural injections in November and December 2010.  SB0205-0219.

Bennetts applied for Short-Term Disability benefits in November 2010, for which AT&T determined that he was eligible.  Bennetts's Short-Term Disability benefits expired after 52 weeks.

Prior to expiration of his Short-Term Disability benefits, Sedgwick informed Bennetts that he may be eligible for Long-Term Disability benefits and invited him to submit information regarding his possible eligibility.  SB0190-204.  The letter stated that Bennetts needed to sign and return the enclosed forms within 14 days so that Sedgwick could evaluate his eligibility for Long-Term Disability benefits.  When Bennetts did not return the forms within 14 days, Sedgwick placed five follow-up phone calls with Bennett.  SB0003, SB00004-5, SB0006, SB0007.  During the telephone call on August 19, 2011, Bennetts explained that he was in physical therapy and would not know where he was in terms of recovery until he saw Dr. Adams on October 6, 2011.  SB0005.

On October 6, 2011, Dr. Adams noted that he met with Bennetts for a two month follow up with new x-rays done at Covenant.

> Patient states he is feeling great and having very little pain.  He is having some muscle spasms. Once in a while he does have some tingling in both hands.  Patient states that he has discontinues[sic] his physical therapy due to increase in pain whenever they had him use pulleys and weights.

SB0268.  Dr. Adams also noted that: (1) Bennetts's VAS[1] pain score was one; and (2) Bennets was having no side effects from the medication he was taking.  *Id.*  After performing a neurologic evaluation of Bennetts, Dr. Adams noted: "The patient is able to walk.  The patient's sensation to pain and light touch is intact.  The cranial nerves 2 through 12 are grossly intact.  Romberg[2] is negative.  Babinski[3] is negative."  SB0270.   After reviewing Bennetts's diagnostic testing, Dr. Adams wrote: "Reviewed results of x-rays fusion mass and alignment excellent."  *Id*.  Dr. Adams concluded that Bennetts had "displacement of cervical intervertebral disc without myelopathy" and that he "[n]eeds to remain off work."  SB0270-71.

The next day, October 7, 2011, Dr. Adams completed Sedgwick's questionnaire regarding Bennett's Short-Term Disability benefits.  Dr. Adams reaffirmed Bennetts diagnosis, displacement of cervical intervertebral disc without myelopathy, and then wrote that Bennetts was "to remain off work – w/ restrictions of no bending, twisting, pushing, pulling, reaching, stooping, or lifting more than 10 lbs."  SB0272.

About one month later, on November 1, 2011, Dr. Adams supplemented his response to Sedgwick's Short-Term Disability questionnaire and maintained that Bennetts would be unable to return to work:

1)  Is the patient able to return to work with restrictions?  If so, please list them here:

   No.

---

[1] The Visual Analog Scale (VAS) "is a psychometric response scale which can be used in questionnaires.  It is a measurement instrument for subjective characteristics or attitudes that cannot be directly measured.  When responding to a VAS item, respondents specify their level of agreement to a statement by indicating a position along a continuous line between two end-points."  http://en.wikipedia.org/wiki/Visual_analog_scale, last viewed June 4, 2014.

[2] A positive Romberg test indicates a "loss of the sense of position in which the patient loses balance when standing erect, feet together, and eyes closed."  http://medical-dictionary.thefreedictionary.com/Romberg+test, last viewed on June 4, 2014.

[3] A Babinski sign is a "reflex movement of the big toe upward instead of downward when the plantar aspect of the foot is stroked, a manoeuvre used to test injury to, or diseases of, the upper motor neurons."  http://medical-dictionary.thefreedictionary.com/Babinski+reflex, last viewed on June 4, 2014.

2)  Are the restrictions permanent or temporary?

Currently permanent.

SB0289.

## C

On November 4, 2011, after reviewing the information sent by Dr. Adams, Sedgwick's Job Accommodation Specialist Priscilla Harris performed a transferable skills analysis based on Bennetts's medical records, education, work history, and physical restrictions. SB0277-279. After reviewing Bennetts medical history[4] and restrictions, Ms. Harris concluded that:

> Mr. Bennetts retains the ability to work in situations that involve adhering to and achieving exact levels of performance, using precision measuring instruments, tools, and machines to attain precise dimensions. He also has worked in situations that involve solving problems, making evaluations, or reaching conclusions based on subjective or objective criteria.

SB0278. Accordingly, Ms. Harris determined that Bennetts was capable of performing three sedentary occupations: a service order clerk, a routing clerk, and an order clerk.

## D

On November 14, 2011, Dr. Adams completed Sedgwick's questionnaire regarding Bennett's Long-Term Disability benefits. Dr. Adams explained that Bennetts had "neck pain that radiates into bil[ateral] shoulders and down middle of spine" and that the "pain has increased" since his October office visit. SB0291. Dr. Adams noted that Bennetts's functional limitations permanently included "no strenuous activity, no repetitive pushing, pulling, bending,

---

[4] Ms. Harris's recitation of Bennetts medical history provides one of the more complete descriptions, and therefore it will be reproduced here for additional context:

> By way of summary, the employee is a 46-year-old Customer Service Specialist with AT&T. He was off of work 11/17/2010 due to severe neck pain (cervical disc displacement and cervical spondylosis without myelopathy). He is status post cervical fusion with disc osteophyte at C6-C7 with central canal stenosis and bilateral neuroforaminal stenosis with a bilateral C6-C7 radicular pattern. He had ESIs on 11/9/10, 11/23/10/, 12/7/10, which did not provide much relief. He underwent posterior cervical laminectomy C3-C7 with lateral mass instrumented fusion on 4/21/11.

SB0277.

stooping, [and] no lifting more than 5 lbs." SB0291-293.  Finally, Dr. Adams addressed whether

Bennetts would be able to return to work in any capacity:

> 4. How does BENNETTS, SCOTT M[sic] **impairment interfere with his ability
> to work at <u>ANY</u> occupational capacity?**
>
> Not able to work. . . .
>
> 6. Has return to work been incorporated into BENNETTS, SCOTT M[sic] current
> treatment plan? **Please provide an estimated return to work date.**
>
> Permanently off work
>
> 7. In an **eight-hour workday, BENNETTS, SCOTT M can**: (Circle full hourly
> capacity for each activity) [e.g. sitting, standing, walking]
>
> 0 [hours per day]

SB0291-92 (emphasis original).

Sedgwick provided Dr. Adams November 14, 2011 questionnaire to Ms. Harris, who

responded that the new questionnaire had no impact on her original assessment that Bennetts was

capable of performing sedentary work.  SB0030.

On November 18, 2011, Sedgwick sent Bennetts a letter stating that it was denying his

claim for Long-Term Disability benefits.  The letter stated, in part:

> Our determination to deny benefits is based on a review of medical
> documentation provided by Mark S. Adams, MD.  This information indicated that
> you are status post cervical laminectomy at C3-4, C5-6, and half of C7 on April
> 21, 2011.  Following the surgery a round of physical therapy was ordered [and]
> has since been discontinued due to pain exacerbation.  Updated medical
> information received from Dr. Adams on November 14, 2011 provided a list of
> permanent restrictions and limitations as follows:
>
> •  No  bending, twisting, pushing, pulling, reaching, stooping
> •  No lifting more than 5 pounds
>
> Because it was identified that you should be able to return to work with the above
> restrictions and limitations, a transitional skills analysis was completed.  The
> following alternative occupations were identified as position you would be able to
> perform

- 6 -

- Service Order Clerk
- Routing Clerk
- Order Clerk

Clinical information does not document a severity of your condition(s) that supports your inability to perform any occupation as of November 23, 2011.

SB0308-318.

## E

On March 30, 2012, Bennetts, through counsel, submitted a letter stating his intent to file an administrative appeal of the denial of Long-Term benefits claim.  Sedgwick responded by stating that Bennetts, on appeal should provide medical evidence of his disability, including:

- A clear outline of your level of functionality

- A description of how your level of functionality impacts your ability to work and perform your daily activities

- A detailed description of the treatment provider's rationale for your level of functionality

- Clinical documentation that supports the treatment provider's rationale

SB0311. On May 25, 2012, as part of his appeal, Bennetts provided several additional documents.

The first was a May 18, 2012 vocational rehabilitation analysis from Fuller Rehabilitations, LLC. During Mr. Fuller's examination, he noted Bennetts's description of his pain:

> "I don't have many good days and I'm never without pain," he states that his pain level on a 1/10 scale is "at least an 8 constantly."  When asked if there was any relief subsequent to his surgery he stated "the surgery was to prevent paralysis, but the pain never stopped." When asked what he does to control the pain in addition to taking prescribed medication, he states "I lay down 50%-75% of the day, I'm in the Lazy Boy with a pillow to support my neck, then I go to the chaise, then to another chaise, then to bed.  I use horseshoe pillows, but I find it best to sleep without a pillow. . . . he also has difficulty with "the arms, to put

- 7 -

them out in front of me is painful, I have pain in the shoulders and down the arms,
no overhead, and moving the arms to the side is also painful."

SB0126-127.  Mr. Fuller noted that Bennetts "demonstrated obvious pain behaviors . . . ."  *Id.*

As a result, Mr. Fuller concluded that Bennetts was incapable of performing any work,

even with restrictions:

> Based on the restrictions of Dr. Adams and the description by Mr. Bennetts of his
> physical capabilities, he would be incapable of even sedentary unskilled work.
> He has difficulty with sitting, standing, walking, lifting, postural activities, finds it
> necessary to recline the majority of the day, is in pain which, by most standards,
> would be considered extreme, is taking a number of narcotic pain medications,
> describes difficulty with concentration and attention, stating specifically 'it's
> difficult with the pain to concentrate" . . .

> As a result of the entire set of circumstances provided, it is clear that Mr. Bennetts
> is not a candidate for Vocational Rehabilitation services, has no wage earning
> capacity (unable to work even in sheltered employment), and his case file is being
> closed, unfeasible.

SB0128.

The second and third document Bennetts provided on appeal were letters from his

neurologist, Dr. Adams.  In a December 19, 2011 letter, after reviewing Bennetts's surgical

history, Dr. Adams opined that Bennetts's pain would prevent him from returning to any type of

employment:

> Scott is a very pleasant gentleman who has failed all conservative therapy.  He
> has done physical therapy.  He has done injections.  These have not relieved his
> pain.  He has had surgery that has also not relieved his pain.  Unfortunately, due
> to the extent of his surgeries, I do feel that he is totally and permanently disabled.
> He would not be able to return to work in any position due to his severe limited
> range of motion at the neck.  He would not be able to do any work where he had
> to look overhead.  He would need to frequently change positions.  He would not
> be able to sit at a desk and type for any length of time or any type of job where he
> had to sit with his head in a fixed position.  Overhead work would be completely
> limited due to his range of motion, and any work where he had to turn his head
> frequently would also be contraindicated.  He is extremely limited in his range of
> motion due to these reasons and the extensive cervical fusion that he has
> undergone.  I truly feel that Mr. Bennetts would like to return to work and really

hoped to be able to; however, it would be unrealistic that he would ever be able to
return to any type of gainful employment due to the limitations that he has.

SB 0130.  Dr. Adams summarily reiterated this opinion in a February 12, 2012 letter: "Patient is

unable to return to work in any capacity due to restrictions of no pushing or pulling, no bending,

twisting, reaching above head, lifting more than 10 to 15 lbs.  He will need to change position

frequently for pain relief."  SB0132.

Bennetts also presented a disability certificate and a physician statement for the workers'

compensation bureau—both of which were completed by Dr. Adams.  SB0134-35.   The

disability certificate and the physician statement reiterated Dr. Adams's previous findings: that

Bennetts suffers from neck pain and has significant restrictions on his ability to push, pull, twist,

bend, and lift.

Dr. Adams also prepared a cervical spine residual capacity questionnaire for the Social

Security Administration, which Bennetts presented on appeal.  Dr. Adams provides further

details on Bennetts's functional limitations.  After summarizing Bennetts's prognosis as "bad",

Dr. Adams reported that Bennetts suffered from tenderness, muscle spasms, muscle weakness,

chronic fatigue, abnormal posture, "drops things", and reduced grip strength.  SB0136.  Dr.

Adams believed that Bennetts's pain would "constantly" interfere with the "attention and

concentration needed to perform even  simple work tasks."  SB0138.  Moreover, he emphatically

indicated that Bennetts would "not." be able to sit, stand, or walk in an 8-hour work day.

SB0140.

Finally, Bennetts also submitted a November 10, 2011 progress note form Dr. Adams's

office.  SB0142-147.  Someone in Dr. Adam's office noted that:

> [Bennetts] is not going to be able to work in any capacity.  He would not ever be
> able to do a sedentary job do to the fact that he would need.  A frequent sit/stand
> option, no bending, lifting twisting of neck there would also be a 10-15 pound

weight limit.  No excessive push/pull.  Because of these limits I do not feel he
would be able to return to work.  I have discussed these restrictions with Dr.
Adams and he agree.[sic throughout]

SB0145.

**F**

After receiving Bennetts's appeal documents, Sedgwick contracted with Network
Medical Review Co. Ltd. to perform a medical review.  SB0153-156.  Dr. James T. Tran, a
neurologist, completed the review and issued a report on June 12, 2012.  In his report, Dr. Tran
states that "[a]ll medical information submitted to me was reviewed."  In addition, Dr. Tran
attempted to speak with Mr. Adams twice and Mr. Fuller three times.  Neither Mr. Adams nor
Mr. Fuller was available to speak with Dr. Tran.  After noting Bennetts's surgical history, Dr.
Tran explained that it was his belief that Bennetts's was not permanently disabled:

1.   **Is the employee disabled from any occupation as of November 23, 2011 through present?**

    No.  The patient is not disabled from any occupation as of 11/23/2011 through present.  Even though he has neck and shoulder pain, he is neurologically intact.  There is no clinical evidence of functional limitation from the neck and shoulder pain.

2.   **What is the treating provider's plan for return to work?  In your opinion, is the employee capable of any work?  If so, what work restrictions, if any, are necessary?**

    The provider recommended limitations such as limited lifting, bending, and stooping at work.  In addition, the patient would need 6-7 breaks per 8-hour shift.  The treating provider mentioned that the patient would be absent from work 4-5 days per month.  In my opinion, the employee is capable of any work without restrictions.

3.   **If disabled, what is/are the disabling diagnoses and complicating factors/comorbidities?**

    There is no disability.

4.   **If disabled, what is the rationale or basis for the disability?**

- 10 -

There is no disability.

**5.      If disabled, what is the expected/appropriate length of disability?**

There is no disability.

**RATIONALE:** The patient is not disabled form any occupation as of 11/23/11. Dr. Adams stated that there was limited neck motion.  However, even though Mr. Bennetts has neck and shoulder pain, he is neurologically intact.  There is no clinical evidence of functional limitation from the neck and shoulder pain.  The employee is not disabled from any occupation as of 11/23/11 through present.

SB0155.

On July 9, 2012, Sedgwick sent a letter to Bennetts denying his appeal for Long-Term Disability benefits.  The letter explained that the denial was based on Dr. Tran's opinion, Ms. Harris's November 14, 2011 transferrable skills assessment, and the absence of objective medical evidence of functional limitation in Bennetts's medical records.  The letter noted that "Although some findings [of pain] are referenced, none are documented to be so severe as to prevent your client from working at any occupation or employment . . . ."  SB0162.

## II

Generally, a denial of benefits is reviewed de novo by this Court "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  Here, the Plan's terms indicate that that the administrator has discretionary authority: "[a]ny determination made by the Plan administrator or any delegated third party will not be overturned unless it is arbitrary and capricious."  Stipulation Ex. 1, ECF No. 11.  Moreover, the parties stipulated that AT&T's Plan grants the administrator discretionary authority to determine eligibility for benefits or construe the terms of the Plan and, thus, the Court will review the determination under the arbitrary and capricious standard of review.

"The arbitrary and capricious standard is the least demanding form of judicial review of an administrative action." *Smith v. Continental Cas. Co.*, 459 F.3d 253, 259 (6th Cir. 2006). The plan administrator's decision will be upheld if it is the result of a deliberate, principled reasoning process and is rational in light of the plan's provisions. *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007). "But the arbitrary-and-capricious standard of review is not a 'rubber stamp [of] the administrator's decision.'" *Cooper*, 486 F.3d at 165 (quoting *Jones*, 385 F.3d at 661). "Rather, this standard requires us to review the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Cooper*, 486 F.3d at 165. The administrator must consider the entire record, not selected portions. *Spangler v. Lockheed Martin Energy Sys.*, 313 F.3d 356, 359-62 (6th Cir. 2002).

Despite stipulating that the arbitrary and capricious standard applies in this case, Bennetts nonetheless re-advances an argument he put forth in his motion to allow discovery: that the administrator's decision should be afforded less weight due to a conflict of interest. In his motion for discovery, Bennetts alleged that AT&T is "both the administrator and insurer of the long term disability policy." Pl.'s Opening Br. 2.

A court must take into consideration the conflict of interest that arises when one entity is both the administrator and the insurer: "where there is a monetary incentive for the insurance company or its claims administrator to deny the claim, 'the potential for self-interested decision-making is evidence.'" *Rabuck v. Hartford Life and Acc. Ins. Co.*, 522 F. Supp. 2d 844, 872 (W.D. Mich. 2007) (quoting *University Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 n. 4 (6th Cir. 2000)). This consideration applies, however, only where there is "significant evidence" that the insurer was motivated by self-interest. *Peruzzi v. Summa Medical Plan*, 137 F.3d 431, 433 (6th Cir. 1998).

- 12 -

As explained by this Court in its earlier opinion, there is no "significant evidence" of self-interest in the present litigation. AT&T and Sedgwick are separate entities, and therefore there is no conflict of interest. Op. & Order at 6 (citing *Day v. AT&T Disability Income Plan*, 698 F.3d 1091, 1096 (9th Cir. 2012) ("The Plan is funded by AT&T and not Sedgwick, and administered by Sedwick and not AT&T.")). Accordingly, the Court will not adjust its application of the arbitrary and capricious standard based on Bennetts's incorrect allegation of a structural conflict of interest.

### III

Bennetts contends that he is disabled under the definition in the Plan, and therefore AT&T's denial of his request for Long-Term Disability benefits was arbitrary and capricious. Bennetts explains that, given that he was awarded Short-Term Disability benefits under the Plan, the subsequent denial of his Long-Term Disability benefits request without any evidence of improvement in his condition was arbitrary and capricious. Moreover, Bennetts points to several concerns with the report issued by Dr. Tran—the independent medical professional who reviewed Bennetts's medical file.

AT&T, however, maintains that its decision to deny Long-Term benefits was not arbitrary and capricious. The foundation of its argument is that Bennetts did not present objective medical evidence—as required by the Plan—indicating that he disabled under the Plan's terms.

### A

Bennetts first contends that the denial of Long-Term Disability benefits was arbitrary and capricious because there was no evidence in the record demonstrating any change or improvement in his condition after AT&T had already found that he was entitled to Short-Term

Disability benefits.  He explains that the federal circuits that have considered this issue have uniformly ruled that a plan participant's Long-Term Disability benefits may not be denied in the absence of a showing that the participant's condition has substantially improved.

The Sixth Circuit has held that the cancellation of benefits in the absence of evidence showing that the claimant's condition had improved and without an explanation for the apparent discrepancy from earlier assessments is arbitrary and capricious.  *See Kramer v. Paul Revere Life Ins. Co.*, 571 F.3d 499, 507 (6th Cir. 2009); *see also McCollum v. Life Ins. Co. of N. Am.*, 495 F. App'x 694, 704 (6th Cir. 2012) ("The plan administrator must have some reason for the change.").  "[I]t is reasonable to require a plan administrator who determines that a participant meets the definition of 'disabled,' then reverses course and declares that same participant 'not disabled' to have a reason for the change; to do otherwise would be the very definition of arbitrary and capricious."  *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 984 (6th Cir. 2010) (emphasis original).

These cases, however, are inapposite to the facts at hand because they involved denial of Long-Term benefits under the same standard of disability used to grant Short-Term benefits.  In contrast, here the standard for qualifying for Short-Term Disability benefits is easier to meet than the standard for Long-Term Disability benefits under the Plan.  The Short-Term Disability definition of "disabled" requires the participant to be unable to perform the functions of *his or her specific job*:

> You are considered Disabled for purposes of Short-Term Disability benefits . . . if you are found by the Claims Administrator to be disabled by reason of sickness, pregnancy, or an off-the job illness or injury *that prevents you from performing the duties of your job* . . . .

SB0639 (emphasis added).

- 14 -

Because Bennetts was unable to perform the duties of his original job, he qualified as "disabled" for purposes of Short-Term Disability benefits. Bennetts original job—customer service specialist—is rated as requiring a "Heavy level" of physical demand because it requires a person be able to climb, drive vehicles, and lift up to 150 pounds.  SB 0278.  On December 28, 2010, Sedgwick faxed Dr. Adams a list of Bennetts's job duties so that Dr. Adams could list any restrictions that would affect Bennett's ability to do his job: "I would like to take this time to send Scott's job description to Dr. Adams to review to ensure that all restrictions given apply to all aspects of his job."  SB0243 (emphasis added).  Dr. Adams responded by noting that "[t]he pts restrictions are as follows: No lifting >5#, no bending, twisting, pushing or pulling."  SB0243.  As a result of these restrictions, Sedgwick determined that Bennett was unable to perform the duties of his job, and granted him Short-Term Disability benefits.

In contrast to the standard for Short-Term Disability benefits, the standard for Long Term Disability benefits requires that a participant be unable to perform the job duties of *any job*—not just the participant's original job:

> You are considered Disabled for purposes of Long-Term Disability Benefits under this Program when the Claims Administrator determines that you meet all of the following . . .
>
> • Such illness or injury *prevents you from engaging in any occupation or employment* (with reasonable accommodation as determined by the Claims Administrator) for which you are qualified or may reasonably become qualified based on education, training, and experience . . . .

SB0652 (emphasis added).

In other words, while Short-Term Benefits are awarded when a participant is unable to perform the functions of his job, Long-Term Benefits are not awarded unless a participant meets the higher standard of being unable to perform the functions of any job.  Thus, because the standard changes, improvement in a claimaint's condition is not a prerequisite to a determination

- 15 -

that the claimant is no longer disabled. Hypothetically, a claimant's condition could stay the same and a rational finding could nonetheless be made that the claimant, while still disabled from his own occupation, could still perform the essential duties of some other occupation. Because there was a change in the standard by which Bennett's disability was evaluated, his argument that the termination of benefits was arbitrary and capricious simply because there was no improvement in his condition must be rejected.

**B**

Before addressing the substance of Dr. Tran's file review of Bennetts's medical record, the Court will address Bennett's allegations that Dr. Tran colluded with AT&T. First, the Court can quickly dispose of a factual misconception that Bennetts determinedly repeats throughout his briefs: that AT&T hired Dr. Tran to review Bennetts's medical file. AT&T did not hire Dr. Tran. Dr. Tran was retained by Network Medical Company to review the file. Network Medical Company, in turn, was retained by Sedgwick. As explained above, Sedgwick (the administrator) and AT&T (the insurer) are completely separate, independent companies. Accordingly, Bennetts's repeated assertions that AT&T "hired" Dr. Tran are groundless.

Second, Bennetts asserts that Dr. Tran's failure to speak with Bennetts's physicians is evidence of collusion. Dr. Tran telephoned Dr. Adams's office on two occasions and Mr. Fuller on three occasions, each time requesting a call back within twenty-four hours. Bennetts asserts that these 24-hour deadlines "powerfully suggest[] bad faith."

But as this Court has explained in a previous order, Dr. Tran was under no obligation to contact Bennetts's physicians before rendering his opinion. Op. & Order at 7; *Byrd v. Prudential Ins. Co. of Am.*, 758 F. Supp. 2d, 492, 516 (M.D. Tenn. 2010) (ERISA has no "requirement that an independent reviewer must contact a treating physician."). That Dr. Tran gave Bennetts's

physicians only a short period of time in which to respond to Dr. Tran's report—especially when Dr. Tran was not even required to contact the physicians—is not evidence of collusion.

Nonetheless, a failure to contact a claimant's treating physician may raise questions about the thoroughness and accuracy of the benefits determination. *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 168. And if, as here, the reviewing physician does seek a response from the treating physician, the reviewer "does have to wait a reasonable amount of time and establish that the treating physicians were informed of the importance to their patient of a prompt reply." *Id.* Here, although Dr. Tran attempted to contact Bennetts's physicians several times, there is no indication that he informed them of the urgency or the importance of responding to his inquiries. That is, there is no indication that Dr. Tran provided an explanation for the necessity of a reply within 24 hours. Accordingly, Dr. Tran's haste to complete his report without input from Bennett's treating physicians was unreasonable, and this factor weighs in favor of a finding that his recommendation to deny Bennetts Long-Term Disability benefits was arbitrary and capricious. *See id.* ("We find that Dr. Graulich's haste to complete his report in disregard of his explicit instructions to interview Cooper's treating physicians was unreasonable, especially because he allowed so little time before he 'pulled the trigger.'").

## C

Bennetts also claims that Dr. Tran's recommendation to deny Long-Term Disability benefits had several defects, rendering his recommendation arbitrary and capricious. More specifically, Bennetts asserts that Dr. Tran's review was arbitrary and capricious because Dr. Tran performed only a file review and he ignored evidence of Bennetts's disability. As described below, Dr. Tran's review contained several procedural errors that renders his recommendation to deny Long-Term Disability benefits arbitrary and capricious.

- 17 -

First, Bennetts claims that AT&T erred in relying on Dr. Tran's file review of the medical history, rather than relying more heavily on the opinion of Dr. Adams—the treating physician.  The Sixth Circuit recognizes that "reliance on a file review does not, standing alone, require the conclusion that [the administrator] acted improperly."  *Calvert*, 409 F.3d at 295. Moreover, there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination."  *Id.* at 296.  However, the decision to conduct file reviews, rather than a physical examination, is a factor properly considered in determining whether AT&T's decision was arbitrary and capricious.  *Rose*, 268 F. App'x at 450; *see also Hunger*, 437 F. App'x at 378 ("The failure to perform a physical examination is one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician.").

Nevertheless, "the failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination."  *Helfman v. GE Group Life Assur. Co.*, 573 F.3d 383, 393 (6th Cir. 2009) (quoting *Calvert v. Firstar Fin. Inc.*, 409 F.3d 286, 296 (6th Cir. 2005).  Here, AT&T specifically reserved the right, at its own expense, to have the claimant "[r]eport for a medical examination by a Physician designated by the Claims Administrator if the Claims Administrator requires this examination . . . ."  SB0653.  Because the Plan reserved the right to examine Bennetts in person, the failure to do so raises questions about the thoroughness and accuracy of AT&T's review of his claim.

The decision to rely solely on a file review becomes especially meaningful when, as here, the file reviewer must make credibility determinations.  *Hunter*, 437 F. App'x at 378 ("the lack of a physical examination is particularly troublesome where, as here, the file reviewers make

critical credibility determinations."); *see also Calvert*, 409 F.3d at 297 n. 6 ("[T]here is nothing inherently improper with relying on a file review . . . . Where, as here, however, the conclusions from that review include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate."). Here, Dr. Tran was forced to make credibility determinations regarding Bennetts's self-reported pain and its effect on his functional limitations because he did not exam Bennetts in-person.

Because of the inherent difficulties of making credibility determinations using only a file review, the reviewer must follow reasonable procedures in deciding whether a claimant is disabled. *Combs v. Reliance Std. Life Ins. Co.*, 2012 WL 1309252, at *9-11. "Reasonable procedures" require that the file reviewer perform a comprehensive, rather than selective, review of the records when rejecting claimant's self-reported symptoms. *Ebert v. Reliance Standard Life Ins. Co.*, 171 F. Supp. 2d 726, 239-40 (S.D. Ohio 2001). This is particularly true when there is, in fact, objective medical evidence of the underlying condition which forms part of the basis of an opinion that a claimant is disabled due to pain. *Id.* (where the record contained evidence of physical conditions that could reasonably cause pain, it was a "complete misreading of the medical records . . . to say that Plaintiff's complaints of pain or weakness . . . are subjective and unverifiable."). Indeed, even where there is no objective medical evidence, a file reviewer may not simply disregard subjective reports of symptoms. *Calvert v. Firstar Fin.*, Inc., 409 F.3d 286, 296 (6th Cir. 2005).

Here, Dr. Tran did not use reasonable procedures when determining that there was no objective or subjective evidence of disability. Dr. Tran rejects the notion that Bennetts's self-reported pain renders him unable to work: "Even though he has neck and shoulder pain, he is neurologically intact. *There is no clinical evidence of functional limitation* from the neck and

should pain." SB0155 (emphasis added). Even assuming for the moment that there is no objective evidence of functional limitations, Dr. Tran has not explained why he chose to summarily dismiss Bennett's complaints of pain. This summary rejection of complaints regarding subjective symptoms is the type of decision that is usually arbitrary and capricious, absent an independent medical examination. *See, e.g., Pitts v. Prudential Insurance Co. of Am.*, 534 F. Supp. 2d 779, 790 (S.D. Ohio 2008) (failure to perform an independent medical examination when a lack of objective data verifying the severity of any potential disabilities is used to support a decision to terminate benefits is arbitrary and capricious.). Dr. Tran made a credibility determination regarding Bennetts's pain complaints without performing an independent medical examination, and therefore this factor indicates that the decision was arbitrary and capricious.

Moreover, Dr. Tran "may not arbitrarily repudiate or refuse to consider the opinions of a treating physician." *Glenn*, 461 F.3d at 671. Dr. Tran did not explain why he rejected Dr. Adams November 14, 2011 recommendation that Bennetts needs to remain "permanently off work" and his December 19, 2011 recommendation that Bennetts "is extremely limited in his range of motion" and "would not be able to return to work in any position due to his severe limited range of motion at the neck." In direct contrast to Dr. Adams's evaluations, Dr. Tran summarily concluded that "There is no clinical evidence of functional limitation from the neck and shoulder pain." This conclusory statement, made in apparent disregard of Bennetts's treating physician's repeated findings of disability, indicates Dr. Tran's conclusion was arbitrary and capricious: "Without at least some sort of explanation for his dismissal of the conclusions of [claimant's] treating physicians, reliance on [the reviewer's] report was not 'the result of a deliberate, principled reasoning process . . . supported by substantial evidence.'" *Gillespie v.*

*Liberty Life Assur. Co. of Boston*, 2014 WL 2219170, at *3 (6th Cir. May 30, 2014); *see also Cooper*, 486 F.3d at 170 ("The failure of . . . independent-review physicians . . . to explain why they [have] disregarded the opinions of [treating doctors] is arbitrary.").

Dr. Tran did not reach his decision to deny benefits based on a "deliberate, principled reasoning process . . . supported by substantial evidence." *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 552 (6th Cir. 2008). Dr. Tran relied on a file review rather than examining Bennetts personally, despite his right to do so. This reliance on a file review was arbitrary and because Bennetts's disability claim involved credibility determinations and because Dr. Tran summarily rejected Bennetts's physicians' findings of functional limitations without explanation. Accordingly, because Dr. Tran did not use reasonable procedures in denying Bennetts's claim, his recommendation to deny benefits was arbitrary and capricious.

**B**

AT&T, on the other hand, claims that Bennetts is not entitled to Long-Term Disability benefits. The foundation of AT&T's position is that there is a complete lack of objective medical evidence supporting Bennett's contention that he is disabled. Indeed, the Plan indicates that a claimant is considered to have a long-term disability when he has "an illness or injury . . . supported by objective Medical Documentation . . . ." SB0652. AT&T contends that the only objective medical tests presented by Bennetts—the negative Romberg test, the negative Bainski test, and the "excellent" x-rays—show no indication of any functional limitation. Thus, AT&T contends, the scant objective medical documentation indicates that Bennetts does not qualify as "disabled" under the Plan.

The Sixth Circuit has recognized the tension accompanying a claim for benefits for injuries with inherently subjective symptoms and the demand for objective evidence of the illness:

> Back-pain cases are notoriously hard to pin down: hard for a claimant to connect her complaints of pain to medical evidence; hard for a treating physician to explain how much of the diagnosis arises from objective evidence rather than from subjective complaints; and hard for a reviewing physician to verify the truthfulness of a claimant's complaints. All of this makes it particularly important for plan administrators to use a "deliberate, principled reasoning process" in reviewing benefits claims in this area . . . .

Cooper, 286 F.3d at 173 (Sutton, J. dissent).

Here, there is no doubt that Bennetts suffered a neck and back injury that required two cervical fusion surgeries—indeed, the objective medical evidence shows as much. Moreover, it is clear that Bennetts suffered from subjective complaints of neck and back pain. His physician, Dr. Adams, and his vocational rehabilitationist, Mr. Fuller, opine to the fact that Bennetts suffers from severe pain.

The contentious issue here is whether there is objective medical evidence that this neck and back pain renders Bennetts incapable of working. AT&T claims that there is only one piece of objective evidence that may support Bennetts claim: the MRI that reported that "narrowing" of Bennetts neural foramina and spinal canal. SB0220-222. Neither Dr. Adams nor Dr. Tran explains, however, how the results of the MRI provide objective medical evidence supporting or undercutting Bennetts claimed functional limitations. Without an explanation of how this narrowing could affect Bennetts's medical condition, this Court cannot determine how to evaluate this medical evidence. *See Cooper*, 486 F.3d at 175 ("While a thorough review of the record and several medical dictionaries might illuminate some of these statements . . . federal judges are ill-equipped to wade through this kind of evidence in the first instance . . . .").

Therefore, it is appropriate for medical professionals such as Dr. Adams or Dr. Tran, and not this Court, to determine whether the MRI is objective medical evidence of disability.

In addition to the medical evidence provided by the MRI, at least one district court has held that, when evaluating the extent of disability due to back pain, objective medical evidence can include medical records indicating that a claimant underwent a major medical surgery that could result in such pain:

> The single fact is that Plaintiff underwent major surgery, including a lumbar laminectomy and discectomy. It is a complete misreading of the medical records involved in this case to say that Plaintiff's complaints of pain or weakness in the leg are subjective and unverifiable.

*Ebert*, 171 F. Supp. 2d at 740; *see also Caudill v. Hartford Life and Acc. Ins. Co.*, 2014 WL 1922828, at *20 (S.D. Ohio May 14, 2014). In the instant case, as in *Ebert*, Bennetts is suffering from back and neck pain due to two cervical fusion surgeries. These surgeries are objective explanations for Bennett's pain and lack of functional mobility. That Dr. Tran concluded that "[t]here is no clinical evidence of functional limitation from the neck and shoulder pain" ignores the effect that the back surgeries may have had on Bennetts pain and functionality.

Moreover, Dr. Adams and Mr. Fuller believe that Bennetts's pain renders him incapable of working; Dr. Tran, after reviewing the file, believes that it does not. This apparent difference of opinion raises several questions: Did Dr. Adams's base his conclusions of disability on Bennetts's subjective complaints of pain, or on his own objective findings developed through examination but not disclosed in the submitted notes? If Dr. Tran had examined Bennetts, as was his right, would he have arrived at the same conclusion as Bennetts's physicians? Would a telephone conversation between Dr. Tran and Dr. Adams or Mr. Fuller have convinced Dr. Tran that Bennetts was disabled? Because these questions go to the heart of whether the denial of Bennetts's claim was arbitrary and capricious, "it is hardly unreasonable to insist that these

questions be answered before an administrator, to say nothing of a court, awards benefits." *Cooper*, at 175 (Sutton, J. dissent).

Given that Bennetts underwent a major surgical operation that could result in severe pain and functional limitations and the myriad of questions remaining concerning the medical evidence in the record, Dr. Tran's summary conclusion that there was no objective medical evidence of disability was arbitrary and capricious. He did not address specific findings by Bennetts's physicians that he was disabled or explain how his conclusion was consistent with the "quantity and quality of the medical evidence" on the record.

Because of the procedural errors plaguing Dr. Tran's review and conclusion that Bennetts was not disabled, AT&T denial of Bennetts's request for Long-Term Disability benefits was arbitrary and capricious. Accordingly, Bennetts's motion for summary judgment will be granted and AT&T motion for summary judgment will be denied.

## V

Bennetts requests that this Court instruct AT&T to reinstate his Long-Term Disability benefits retroactively. However, "where the problem is with the integrity of the plan's decision-making process, rather than that a claimant was denied benefits to which he was clearly entitled," the appropriate remedy is remand to the plan administrator. *Elliott v. Metro Life Ins. Co.*, 473 F3d 613, 622 (6th Cir. 2006). The Court has described several procedural concerns in Dr. Tran's summary denial of Bennetts's claim for Long-Term Disability benefits, and therefore this Court will remand to the Plan Administrator.

## VI

Accordingly, it is **ORDERED** that Bennetts's Cross Motion (ECF No. 21) is **GRANTED IN PART.**

It is further **ORDERED** that AT&T's Motion for Judgment (ECF No. 22) is **DENIED**.

It is further **ORDERED** that this case is **REMANDED** to the Plan Administrator for further proceedings on Bennetts's application for Long-Term Disability benefits.

It is further **ORDERED** that both parties' requests for attorney's fees and costs pursuant to 29 U.S.C. § 1132(g) will be **DENIED**.

<u>s/Thomas L. Ludington</u>
THOMAS L. LUDINGTON
United States District Judge

Dated: June 11, 2014

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 11, 2014.

<u>s/Tracy A. Jacobs</u>
TRACY A. JACOBS

---

- 25 -